## DALLAS ICE FACTORY AND COLD STORAGE COMPANY v. CRAWFORD & CRAWFORD.

Delivered January 22, 1898.

**1.  Corporation—Power of General Manager to Employ Counsel.**

The general manager of a corporation, whose duty it is to take charge of all its business and property and control and direct all the labor and business pertaining to its interests and successful operation, and who is authorized to contract debts for the necessary operation of the business without the order of the board of directors, may bind the corporation by a contract to pay a fee to attorneys consulted by him in reference to a suit against the company to recover a large amount and foreclose a lien on its property given to secure its payment.

**2.  Same—Implied Authority.**

The president and general manager of a corporation has implied authority to employ counsel to represent it in the litigation instituted for or against the corporation, without special action of the board of directors.

**3.  Same—Apparent Authority.**

A corporation is bound by the acts of its president and general manager within the scope of authority which it has permitted them to appear to possess, even though such acts are not within the authority actually conferred by the by-laws of the corporation.

APPEAL from Dallas.   Tried below before Hon. W. J. J. SMITH.

*Geo. H. Plowman* and *J. M. Cary*, for appellants.

*Harris, Etheridge & Knight*, for appellees.

RAINEY, ASSOCIATE JUSTICE.—This suit was instituted by appellees against appellant, a private corporation, to recover $1000, which plaintiffs alleged defendant agreed to pay them in cash as a retainer fee for advice and counsel in reference to certain litigation threatened by one Ball against defendant to recover $40,000, and to foreclose a lien on appellant's property given to secure the payment of said sum.

Defendant answered by general denial, and specially, that if any such contract was made by any of its officers it was not within the scope of their authority as such, and not binding upon appellant.   Plaintiffs recovered judgment, from which the appellant Ice Company appeals.

In 1890 the appellant company was duly incorporated under the laws of Texas for the manufacture and sale of ice, and an organization was duly had.   The by-laws in force when plaintiffs were retained as attorneys provided, among other things, that "the corporate powers of the company shall be vested in a board of five directors," three to constitute a quorum, said directors to conduct, manage, and control the affairs and business of the company and to make rules and regulations not inconsistent with the laws of the State of Texas, of the by-laws of the company, for the guidance of the officers and management of the affairs of the company.   Said directors were required to elect annually a president, vice-president, secretary, treasurer, and general manager.   The president's duties, among others stipulated, were to have direction of the affairs of the company, subject to the advice of the directors.   The duties of general manager were as follows: "A general manager shall be elected annually by the board of directors, who may or may not be a member of the board or a stockholder, and who may be removed at any time by the board for cause.   It shall be his duty to take charge of all the business and property of the company and control and direct all labor and business pertaining to the interest and successful operation of the company's business, and to employ all agents and employes deemed necessary for the carrying on of the business of the company.   He shall receive all moneys of the company, out of which he shall pay salaries, labor, material, and all expenses of every kind connected with the management and operation of the company's business.   The surplus, if any, each month shall be paid over to the treasurer, taking his receipt for the same and furnish the proper vouchers for the disbursements of all funds which may come into his hands.   For the faithful performance of this he shall give bond in such sum as the board of directors may require.   To make statement of all expenditures, accompanying the same with the necessary vouchers, when so required, and shall make statements of the business

of the company, showing resources and liabilities when required by the board of directors or president."

Article 7 of the by-laws is as follows: "Contracting Debts.—Section 1. No officer shall contract any debts without the order of the board except the manager or secretary, who may contract debts for the necessary operation of the business. No moneys shall be expended or contract entered into by any officer of the company for any other purpose than the regular and legitimate conduct of the business of the company without the order of the board of directors."

Article 10 reads: "All officers shall continue to serve until their successors are elected and qualified."

When appellant company was first organized it purchased from Chas. J. Ball an ice plant established by him in the city of Dallas, for which appellant paid a cash consideration in part and executed to said Ball its five promissory notes for $20,000 each, the first to mature in July, 1892, and one annually thereafter. To secure the payment of said notes a deed of trust was executed. This transaction was authorized by the stockholders and the board of directors.

At the time of the transaction in controversy, C. W. Dawley was president of the company, and had been since 1890, and Russell Myrick was secretary, treasurer, and general manager. Myrick was elected secretary, treasurer, and general manager from November, 1890, to 1894, and in the last named year he was elected secretary and treasurer only, but continued to discharge the duties of general manager also (no general manager being elected at that time) until his resignation in 1895. He, as manager, had control of appellant's property and assets. As to the duties performed and authority exercised by Myrick, it was proved that it was his duty under the by-laws to, and that he did, as the ordinary and usual occurrences in the management of the business, employ the superintendent, the engineer and fireman, and other parties in charge of the mechanical department, and the men engaged in selling and distributing ice, and the bookkeeper, and fixed their salaries, superintended collections and extensions of credit, made rebates, purchased coal and other supplies and paid for them, entered into contracts for insurance and made rates with the companies and paid them, made contracts for electric light repairs, attended to the finances of the company, rendered and paid the taxes, attended to the repairs of the wagons; that as treasurer he had custody of the funds and payment out of the funds; that all checks and payments of money through the bank from 1891 to November, 1895, were made on his check as manager, except when he was absent or sick, when Dawley may have drawn a few as president; that he paid the employes, incurred and paid sundry expenses such as advertising; that all claims against the company were audited under his supervision, and that he and Dawley looked after the repairs, except extraordinary repairs, such as buying a new machine or something that involved a great deal of money, which the board of directors acted upon. It was further proved that in 1890 M. L. Crawford, one of the plaintiffs,

drew the charter for defendant's company, for which he charged and received the sum of $500; that Myrick and Dawley never consulted plaintiffs afterward in behalf of defendant company, until this controversy came up, though other attornyes had been employed by Myrick in matters involving small amounts arising in the due course of business.

It was further proved that about September 3, 1894, Myrick and Dawley, representing said company, entered into an agreement with said Ball by which he agreed to divide up and extend the time of payment of the $20,000 purchase money notes executed by the company; that the notes were divided into $10,000 notes, making the payments $10,000 per year for five years from 1894; that in that agreement the rate of interest was increased to 8 per cent, and other stipulations made as to delaying the date of maturity; that all the rights contained in the original instrument were contained in the second one; that at said time no meeting of the board of directors was had; that said agreement was made and signed by Dawley as president, and Myrick as secretary of the company, and bore the company's seal, and no notice of it was given to the board of directors; that in that extension there was involved $50,000, and the matter about which Dawley and Myrick consulted plaintiffs was part of the same debt. It was further proved that the manager's reports indicate something near the volume of business done by the company up to 1895; the report for 1892 shows that he took in $116,669.37, and paid out $48,118.16, not counting a 20 per cent dividend, every dollar of which passed through the hands of Myrick; that the account spoken of is a summary of the books during the year, showing the debts in the ordinary course of the business.

On September 27, 1895, said Ball caused the following notice to be served on R. Myrick, viz: "Dallas, Texas, September 27, 1895. Dallas Ice Factory and Cold Storage Company, Dallas. Gentlemen—In accord with the request of Mr. Chas. J. Ball, of Los Angeles, California, we hereby notify you that on account of default in the payment of his note against the company, due July 10, 1895, he has elected and did elect on the 24th of September, 1895, to declare due according to the provisions of the contract between him and said company, his entire debt against the Dallas Ice Factory and Cold Storage Company, now amounting to $44,750, payment of which sum of $44,750 is hereby demanded. Yours truly, T. J. Freeman, and Alexander, Clark & Hall, attorneys for Chas. J. Ball."

On October 14, 1895, said Ball served the following paper on Myrick and Dawley, viz: "Whereas, the Dallas Ice Factory and Cold Storage Company is indebted to the undersigned in the sum of $40,916.94, which indebtedness, by the election of the undersigned, has been declared due and payable; and,

"Whereas, I, the said Chas. J. Ball, the owner and holder of said paper, demand, first, the payment in full of all of said notes with accrued interest to date; second, in the event, however, that said Dallas Ice Factory and Cold Storage Company desires an extension of said

notes, I agree to grant said extension to the dates now specified in said notes only upon the following conditions, to wit: 1st.   That the Dallas Ice Factory and Cold Storage Company will pay to myself and to my son, P. DeC. Ball, who jointly own $32,000 of the capital stock of said Dallas Ice Factory and Cold Storage Company, a dividend of 10 per cent in cash on said stock for the year 1893 and 1894, and a dividend of 5 per cent in cash on said stock for the year 1895, amounting in the aggregate to $8000, and in addition thereto will obtain a purchaser for the stock now owned by us, to wit, $32,000, at the rate of 40 cents on the dollar, payable as follows: One-fourth in cash, and the balance in one, two, and three years, equal payments, secured to the satisfaction of the said Chas. J. Ball, and in addition thereto will pay interest on said notes to be extended at the rate of 10 per cent per annum instead of 8 per cent, as now borne by said notes, payments to be made upon said notes as now expressed therein.

"This proposition must be accepted, and the said Chas. J. Ball notified thereof in writing by 5 o'clock p. m. this date, October 14, 1895.   This in duplicate.   Chas. J. Ball."

After receiving said notice Myrick and Dawley, as representatives of appellant, called on appellees to consult them about said matter, and employed them as claimed by appellees.   The matter between Ball and the appellant was settled without suit.

The appellant assigns various errors, but we will not discuss them in detail, as we think there is only one controlling question in the case, and that is: Was the authority of Myrick and Dawley, as representatives of appellant, such as to bind the company to pay the fee they contracted to pay the plaintiffs?

The great  weight of authority is to the effect that the president and general manager of a corporation has the implied authority to employ counsel to represent it in litigation instituted for or against the corporation, without special action of the board of directors authorizing it. Emerson, Talcott Co. v. Skidmore, 7 Texas Civ. App , 641; Railway v. James, 76 Texas, 23; 1 Mora. on Corp., sec. 536; 2 Cook on Stockh., sec. 716, p. 1078, sec. 718, p. 1088; 4 Thompson, sec. 4621, sec. 4857; 1 Spelling on Priv. Corp., sec. 194, p. 215; 1 Beach, sec. 210; 5 Am. R. & C. Rep. note, p. 152; 15 Am. and Eng. Enc. Cases, pp. 649-669; Boon on Corp., sec. 128; 1 Waterm., p. 449; 1 Dan. on Neg. Inst., sec. 392; Tied. on Neg. Inst., sec. 121; 24 L. R. A., 719 and note; 14 L. R. A., 360 and note; Trustees v. Connally, 31 N. E. Rep., 1060; Bank v. Keavy, 128 Mass., 298; Reno v. Leete, 30 Pac. Rep., 958; Insurance Co. v. Oakley, 9 Paige; Railway v. Grove, 18 Pac. Rep., 958; Davis v. Railway, 22 Fed. Rep., 886; Johnson v. Milwaukee, 64 N. W. Rep., 1100.

In Insurance Company v. Oakley, above, it is said: "It is a matter of daily occurrence for the president and other head officers of a company to employ and retain attorneys and counsellors to defend suits or to institute legal proceedings in which the corporation is interested, and I doubt whether it is usual to inquire where they are thus retained,

whether there has been a formal resolution of the board of directors authorizing their retainer in the case."

In Railway v. Leete, 30 Pacific Reports, 702, the court said: "In the general course of business of corporations it often becomes necessary to institute legal proceedings for the enforcement of their rights. Prompt action is frequently indispensable, and the delay consequent upon the calling together of a board of directors and the passing of a resolution of authorization might produce damaging results. This suit was commenced at the instance of the president of the plaintiff, the chief executive officer of the corporation. As such officer he was presumably employed to commence suits in its name and to perform such acts as the interest of the corporation demand."

Unless there was greater restriction thrown around Dawley and Myrick than is usually thrown around such representatives of corporations; or, unless there was something in the transaction that would take it out of the scope of their authority, either express or implied, then the judgment of the court below must be upheld. There is nothing in the by-laws that prohibited them from employing attorneys in the regular course of business. Under the by-laws, Dawley, as president, had direction of the affairs of the company, subject to the advice of the directors. And the general manager's duty was to take charge of all the business and property of the company and control and direct all the labor and business pertaining to the interest and successful operation of the company's business, etc., "and was authorized to contract debts for the necessary operation of the business" without the order of the board of directors.

It is contended by appellant that Dawley and Myrick derived their authority solely from the by-laws, and that acts done by them not within the scope of same were not binding upon the company. While this contention is not strictly true, yet if it should be conceded, we are of opinion that the employment of plaintiffs as attorneys to represent the company was an act within the scope of the authority granted both Dawley and Myrick by the provisions of the by-laws. The creation of the indebtedness to Ball was for the purpose of enabling the defendant company to manufacture and sell ice—the business for which the corporation was created. It was an indebtedness which the stockholders of the company evidently contemplated should be met as it fell due out of the profits arising from the operation of the business. Its payment was necessary for the successful operation of the business, and as it was the duty of the manager to receive all moneys of the company and disburse the same for all "expenses of every kind connected with the management and operation of the company's business," we are of the opinion that it was his duty, or at least he was authorized, to pay off this indebtedness as it fell due. This view seems to have been entertained by the directors and officers of the company, for the undisputed facts show that the manager did pay off over $50,000 of said indebtedness, as it fell due, at times borrowing money for the purpose, which was duly reported to

the board of directors from time to time, and duly ratified and approved. Not only was said amount paid as stated, but said manager and the president, Dawley, entered into a contract with Ball in relation to said indebtedness by which the time of payments were extended, the amount of installments and rate of interest changed, which action was never challenged by the directors.

If our conclusion that it was Myrick's duty, or he had authority to pay off said indebtedness as it fell due is correct, it follows that he had authority to seek advice from plaintiffs in relation thereto and contract to pay them a fee.

It is also contended by appellant that said contract was not within the scope of said officers' authority because of its unusual and extraordinary character. We are unable to see in what respect the transaction can be characterized as "unusual and extraordinary," in the sense that the president and general manager of the company would not have authority to seek advice of counsel in relation thereto. It is true the amount involved was large and the threatened foreclosure was a proceeding not common, yet it was not such as might not have been anticipated and expected to arise in the regular course of business. Had Dawley and Myrick contracted to sell or mortgage the corpus of the corporate property to raise funds to pay off and discharge said indebtedness, such might have been considered unusual and extraordinary, and might have afforded some ground for appellant's contention. But their effort was to protect the property from proceedings by Ball, which, if carried out, would have probably lost the property to the company. But, if the matter was unusual and extraordinary, it does not necessarily follow that such was not within the implied authority delegated to Dawley and Myrick. In Railway v. Mother, 5 Texas Civil Appeals, 87, the court quotes with approval from Wood's Law of Master and Servant, as follows: "While the nature of the employment, and the means and methods usually applied in its prosecution are legitimate subjects to consider in determining whether the act of the servant is within the scope of its employment, yet they are by no means decisive, and an act that is unusual, extraordinary, uncommon, entirely novel even, may as equally be within the range of his implied authority as the former." We do not think it is a question whether the amount of Ball's claim or the threatened proceeding against the company were unusual or extraordinary, as affecting the authority of Dawley and Myrick, but whether their act in seeking advice from attorneys in relation to the company's business was so unusual and extraordinary as not to come within the scope of their authority. We have seen that the authorities are to the effect that the representative of a corporation has ordinarily power to employ attorneys for the company to represent it in the ordinary affairs of the company, and we are unable to see from the evidence in the record anything that would relieve this case from the ordinary rule.

An affirmance of the judgment does not necessarily depend upon the

conclusion heretofore reached that Dawley and Myrick acted within the scope of the authority delegated to them by virtue of the by-laws. The rule invoked by appellees we think is the correct one. It is expressed in the following language by Mr. Mechem in his excellent work on Agency, section 270, to wit: "It is lawful for the principal to confer as much or as little authority as he sees fit. He may impose all such lawful restrictions and limitations on it as he thinks desirable, and these restrictions will be binding and conclusive upon third persons, who have notice of them, provided the principal has done nothing to waive or nullify them * * * although the agent violates his instructions or exceeds the limitations as to his authority, he will yet bind his principal to such third persons, if his acts are within the scope of authority which the principal has caused or permitted him to appear to possess." This principle applies to private corporations as well as to individuals. The following authorities support this proposition: Ham v. Drew, 83 Texas, 77; Thomp. on Corp., secs. 4626-4628; Beach on Corp., 317; Johnson v. Milwaukee, 64 N. W. Rep.; 1100; 8 Am. R. and C. Rep., 780; 17 Am. and Eng. Enc. of Law, 135-136.

We think appellant is not in a position to claim that it is exempt from liability. For about five years prior to the contract under consideration Dawley and Myrick were, respectively, president and manager of defendant company. During all that time the business of the concern in all of its departments was conducted and controlled by these two, principally by Myrick. Myrick had the exclusive management of the finances of the company, receiving and disbursing all moneys, he audited all claims, and none were paid except upon his direction; he borrowed money during that period as the company needed it, amounting to $50,000 or $75,000, without the order of the board of directors, and he renewed and paid the obligations issued therefor at his pleasure. The stockholders and directors met annually and approved his action in every particular. The directors took but little active interest in the management of the affairs, and about the only thing done by them, further than to approve the actions of Myrick and Dawley, was to direct the making of some extensive and permanent repairs, which was done under the supervision of these two by special order of the board of directors.

We think the evidence fully warrants the judgment, and it is of such a nature that no other result could have been properly reached.

Judgment affirmed.

*Affirmed.*