CANADIAN LONG DISTANCE TELEPHONE CO. v. SEIBER et al.

(Court of Civil Appeals of Texas. Amarillo. June 21, 1913. Rehearing Denied Oct. 11, 1913.)

1. CORPORATIONS (§ 513*)—ACTIONS AGAINST—PLEADINGS—SUFFICIENCY.

In an action against a corporation upon a note executed in its behalf by its president, allegations in the petition that the defendant corporation made, executed, and delivered to plaintiff its promissory note, which was signed by the president as such, and acting for the company, and that the corporation did, directly or indirectly, authorize the president to purchase plaintiff's property in which transaction the note was given, sufficiently charged that the president was authorized by the board of direc-

tors to execute the note and enter into the contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2017–2027, 2031–2034, 2036–2045; Dec. Dig. § 513.*]

2. CORPORATIONS (§ 513*)—CONTRACTS—AUTHORITY OF OFFICERS.

In an action against a corporation upon a note given for the purchase price of property, allegations of the petition as to plaintiff's knowledge of how the business was carried on and his belief that the president had authority to execute the note in question were immaterial.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2017–2027, 2031–2034, 2036–2045; Dec. Dig. § 513.*]

3. APPEAL AND ERROR (§ 1040*) — REVIEW — HARMLESS ERROR.

In an action against a corporation upon a note, the overruling of an exception to allegations in the petition as to plaintiff's knowledge of how the corporation's business was carried on and his belief that the president had authority to execute the note in question, which was given for the purchase of property, is harmless, even though such allegations were immaterial,

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4089–4105; Dec. Dig. § 1040.*]

4. CORPORATIONS (§ 513*)—ACTION AGAINST—PLEADING—SUFFICIENCY.

In an action against a corporation upon a note given to plaintiff for the purchase price of property, a complaint alleging that the directors knew or could have known by the use of any sort of diligence that the corporation was preparing to take possession of plaintiff's property, and that immediately after the delivery of such properties the corporation caused to be placed upon its books an entry showing that it had purchased the property, all of which was done with the conscious knowledge of the directors, sufficiently charges an estoppel on the part of the corporation to deny the contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2017–2027, 2031–2034, 2036–2045; Dec. Dig. § 513.*]

5. BILLS AND NOTES (§ 120*)—CONSTRUCTION—JOINT PROMISE.

Where a note recites that "we" promise to pay, and is executed by the president of a corporation for the company, and indorsed by him as surety, it must be treated as a joint obligation.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 257; Dec. Dig. § 120.*]

6. BILLS AND NOTES (§ 489*)—PLEADING—ISSUES—INDORSEMENT—EFFECT.

In the absence of appropriate pleadings, the effect of an indorsement whereby a party guaranteed the payment of a promissory note cannot be varied by parol.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1587–1642; Dec. Dig. § 489.*]

7. CORPORATIONS (§ 519*)—CONTRACTS—CONSTRUCTION.

Where plaintiff contracted for the sale of property with the president of a corporation, who signed the contract for the corporation, and executed a note on its behalf, the payment of which he guaranteed by special indorsement, the contract was properly admitted in evidence in an action on the note; there being evidence of the authority of the president to contract, and it being the obvious intention of the par-

ties that the contract and obligation should be that of the corporation, the contract specifically calling the corporation the party of the second part.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2085, 2088–2089, 2091, 2093; Dec. Dig. § 519.*]

8. CORPORATIONS (§ 400*)—CORPORATE CONTRACTS—VALIDITY.

The validity of a corporate contract of purchase cannot be affected by the seller's want of knowledge that the corporation had bylaws, or that the officer lacked authority to bind it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1587, 1590, 1591; Dec. Dig. § 400.*]

9. APPEAL AND ERROR (§ 1050*) — REVIEW — HARMLESS ERROR.

In an action upon a corporate contract, the improper admission of evidence that plaintiff did not know the corporation had by-laws, or that the officer who executed the contract lacked authority to bind it, is harmless, being negative in its character, where there is abundant evidence of authority in fact.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

10. CORPORATIONS (§ 406*)—CONTRACT—AUTHORITY OF OFFICERS.

Where the directors own all the shares of a corporation, they may agree in their character of stockholders, and without a formal vote at directors' meeting, to authorize an officer to purchase property for the corporation, and a contract executed in pursuance therewith will bind the corporation, where not dissented to by the majority of the directors; Rev. Civ. St. 1911, art. 1153, providing that the majority of the directors of a corporation shall constitute a quorum, and be competent to transact all its business, this being particularly true where the dissenting director stated that whatever the other two directors did would be satisfactory to him.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1611–1614; Dec. Dig. § 406.*]

11. CORPORATIONS (§ 383*)—"MINUTE BOOK"—NATURE.

The minute book of a corporation is merely a record of the corporate acts, and a recordation of acts of the corporation is not necessary to their validity.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1542–1544; Dec. Dig. § 383.*]

12. CORPORATIONS (§ 400*)—ACTS OF CORPORATE AGENTS—EFFECT ON PRINCIPAL.

The rule that an agent, though violating his instructions, can bind his principal to the extent of the apparent scope of his authority applies to corporations.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1587, 1590, 1591; Dec. Dig. § 400.*]

13. CORPORATIONS (§ 432*)—CORPORATE ACTS—RATIFICATION.

When an unauthorized act of a corporate agent or officer is beneficial to the corporation, and it acquiesces by an acceptance of the benefit, very slight evidence of a ratification is necessary to charge the corporation with liability for the agent's acts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717, 1718, 1724, 1726–1735, 1737, 1743, 1762; Dec. Dig. § 432.*]

14. CORPORATIONS (§ 432*)—UNAUTHORIZED ACTS OF AGENT—RATIFICATION—EVIDENCE—SUFFICIENCY.

In an action against a corporation upon a note executed by the president in pursuance of a contract which he was not authorized to make by a formal vote of board of directors, evidence *held* to show a ratification.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717, 1718, 1724, 1726–1735, 1737, 1743, 1762; Dec. Dig. § 432.*]

15. CORPORATIONS (§ 521*) — LIABILITY ON NOTES—INSTRUCTIONS.

Where the president of a corporation purchased property in its name from plaintiff, and gave a note in payment thereof, which he also personally guaranteed, a requested charge to find for defendant in an action on the note, if it was found that plaintiff had stated that he was not looking to the corporation for payment but to the president, was properly refused, as there could not be a finding for defendant, unless it was found as a fact that plaintiff intended to hold the president alone and that the corporation had been in some way released.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2094–2098; Dec. Dig. § 521.*]

Appeal from District Court, Hemphill County; F. P. Greever, Judge.

Action by C. S. Seiber against the Canadian Long Distance Telephone Company and another. From a judgment for plaintiff, the named defendant appeals. Affirmed.

Hoover & Hoover and Baker & Sanders, all of Canadian, for appellant. Willis & Willis, of Canadian, for appellee.

HALL, J. This suit was originally instituted in the district court of Hemphill county by C. S. Seiber against appellant and one A. M. Newman to recover upon a promissory note, dated January 13, 1909, in the sum of $2,950, made payable to plaintiff. Plaintiff's allegation is that the note was the obligation of appellant company, and that its payment was guaranteed by the said A. M. Newman. On a former appeal judgment against A. M. Newman was affirmed, and a judgment rendered upon an instructed verdict in favor of appellant herein was reversed and remanded. 151 S. W. 585. The following statement of the pleadings is taken from appellant's brief:

"The case was tried upon plaintiff's first amended original petition, in which plaintiff alleged in substance the execution and delivery of the note, and alleged as the only description thereof that the defendant, Canadian Long Distance Telephone Company, made, executed, and delivered to the plaintiff its certain promissory note, and further that the said note was indorsed on the back thereof, 'I hereby guarantee the payment of the within note when due or on demand any time after due. A. M. Newman.' Plaintiff alleged that the note was given in payment of certain telephone property described in the petition, and that the Canadian Long Distance Telephone Company had conveyed or

attempted to convey all their property to the Southwestern Telegraph & Telephone Company. Plaintiff further alleged that, if the said telephone company never authorized the purchase of said property by A. M. Newman, as its president, and to execute the note sued on by direct resolution of its board of directors, recording in its minutes, that said company did by means directly or indirectly authorize A. M. Newman to make said purchase on account of the company, by reason of the fact that Newman organized the business of the corporation; that at the time of the purchase there were but three stockholders and directors, A. M. Newman, O. R. Newman, and H. E. Hoover, and that at the time the company was organized it was known to the incorporators that the plaintiff had telephone lines, properties, etc., and that the business was conducted in the name of A. M. Newman, who usually signed himself as president of said corporation, and that he continued all the while to own three-fourths of the capital stock of the telephone company, and was the titular manager of the said corporation, and directed every business move of the company, and that Hoover was only employed as an attorney, and only owned four shares of the company, and took no interest in the management of the company, but left the same to A. M. Newman, and that it was well known to the plaintiff and all persons generally that at the time of making the contract the telephone company was doing business in the name of A. M. Newman, and that the said A. M. Newman, with the knowledge and consent of the directors, transacted all manner of business for the corporation without being formally authorized by a meeting and vote of said directors, and that in most of their business dealings the directors had no meeting nor votes, and recorded no minutes. Plaintiff further alleged that all the property of the company up to the time of the giving of the note was acquired through A. M. Newman, with the knowledge and consent of the directors, and that the company had no available funds at that time, and that Newman furnished the funds on his own private account, with the knowledge and consent of the directors; that Newman borrowed money, joined by H. E. Hoover, from the First National Bank, for the purpose of prosecuting the business of the company by signing notes identical with the note in question. He further alleged that he, plaintiff, knew that the owners of the capital stock had been permitting Newman to conduct all of its business, and accepting the benefits therefrom; that at the time of signing the contract was told by A. M. Newman and O. R. Newman that they were purchasing said telephone properties for and on account of the Canadian Long Distance Telephone Company; that when it came to giving the note he was un-

willing to accept the note of the company, and thereupon Newman guaranteed it personally. He further charged that A. M. Newman did have the express authority of all the directors and shareholders of the company in the transaction, and further charged that if there was any irregularity in the transaction that the same was ratified and confirmed in that all of the directors knew or should have known that Newman so executed the note. Plaintiff then alleged that the accounts of the company were audited by one Hart with reference to the dealings of A. M. Newman, and that the company ratified and confirmed the purchase of the property by attempting to convey the same to the Southwestern Telegraph & Telephone Company. He further charged that he was never aware of any falsity or lack of authority in Newman to execute the note.

"The defendant's first amended original answer, upon which the case proceeded to trial, consisted of a general demurrer, and various special exceptions, and general denial, and sworn plea of non est factum as to the execution of the instrument sued upon; also a special answer denying that the plaintiff had parted with his property on the faith and credit of the telephone company, and further alleged that defendant knew nothing of the execution of the note or the instrument until January, 1911, at which time it promptly notified plaintiff that there was no authority to execute the note, and that it denied all liability thereon, and that they never heard from the plaintiff again until after the property had been sold; that the plaintiff permitted the matter to stand for several months thereafter without any answer to its notice until Newman became insolvent. He further set out facts and prayed for judgment over against the defendant Newman."

A trial before a jury resulted in a verdict and judgment against the defendant company, and in favor of the plaintiff for $4,027.-37, and costs of suit, and in favor of appellant company against A. M. Newman in the same amount.

The appellee objects to that part of appellant's statement of the pleadings wherein it is stated that appellee was unwilling to accept the notes of the company, and suggests that the allegation is that he demanded security upon the company note. The following is the allegation from the petition itself: "But plaintiff was unable and unwilling to accept said note without the said company would secure him in some way, and therefore and thereupon said officers promised and agreed with plaintiff that they would give the plaintiff the note of Canadian Long Distance Telephone Company, and secure the same by A. M. Newman's guarantee as an individual upon the back thereof, and that the note herein sued out was executed in pursuance of the said agreement."

The greater part of appellant's assignments are objected to by appellee upon various grounds. We have found many of them to be well taken; but in view of the interest involved we have decided to waive the defects, since they are formal, and pass upon the entire case.

[1] Appellant's first assignment is: "The court erred in overruling and in not sustaining the defendant's third special exception contained in its first amended original answer to the plaintiff's first amended original petition, because said petition failed to state or aver that A. M. Newman was authorized by the board of directors of the defendant company to execute the note as the act of said company." This assignment is without merit. Plaintiff makes the following allegations: "On the 13th day of January, A. D. 1909, the defendant, the Canadian Long Distance Telephone Company, made, executed, and delivered to this plaintiff its certain promissory note," etc. Again, plaintiff says that "said note was signed by said A. M. Newman aforesaid as president of the Canadian Long Distance Telephone Company for and as the act of said company," etc. Again, "yet plaintiff says that said company did also by other means directly and indirectly authorize said A. M. Newman to make said purchase on account of the following facts." Again, "Plaintiff further says that he since learned that said Newman did have the express authority of all the directors and all the shareholders of the Canadian Long Distance Telephone Company to purchase said telephone property of the plaintiff for said company." We think these allegations, when construed in connection with the further allegations in the petition that the contract was executed by authority of the company, are sufficient to charge that Newman was authorized by the board of directors to execute the note.

The second assignment is: "The court erred in overruling and in not sustaining the defendant's fourth special exception contained in its first amended original petition, because the petition states that a contract was entered into for the purchase of plaintiff's telephone property by A. M. Newman and O. R. Newman, and fails to state that they were authorized to enter into the contract on the part of the company." What has been said in disposing of the first assignment also disposes of this assignment.

[2, 3] The third assignment does not fairly set out the objections urged by the eleventh special exception, and we will consider only that part of it which was raised by the exception, and that is "because the statements contained in the first amended original petition, if true, as to plaintiff's knowledge as to how the business was conducted, and that plaintiff believed that Newman was authorized to make the deal, were immaterial and irrelevant," and that the court erred in not sustaining the exception to such allegations. We agree with appellant that upon the question of A. M. Newman's authority to execute the note that such allegations were immaterial; but in our opinion the failure of the court to sustain the exceptions was not reversible error.

[4] By its fourth assignment of error it is urged that the court erred in not sustaining appellant's twelfth special exception. The exception is as follows: "This defendant excepts to all that part of said petition in which the plaintiff seeks to set up an estoppel as against this defendant, and attempts to plead that this defendant had ratified the acts of the said Newman, and says that same is insufficient, because the said petition fails to state and nowhere avers that this defendant at any time after learning that the said Newman had purchased said property for this defendant and had executed this defendant's obligation therefor, if he did so, this defendant as the law directs with such knowledge ratified such act or acts." The court is sustained in its ruling by the allegations in the petition as follows: "That during said time all the aforesaid directors knew or should have known by the use of any sort of diligence that they were themselves preparing to take charge of the Seiber telephone properties under and by virtue of the contract which ran in the name of Canadian Long Distance Telephone Company, and that with such conscious knowledge, said directors caused," etc. Further, "Immediately after the delivery of said properties to said company the said company caused to be placed upon its books an entry, showing that said corporation had paid, * * * and said entries remained upon said corporation's books with the conscious knowledge of all the directors of said company," etc. This assignment is also overruled.

The fifth assignment calls into question the action of the court in permitting the plaintiff to read in evidence to the jury the contract entered into between defendant and the plaintiff on the 28th day of November, 1908, because it was not shown that the officers who executed the contract had any authority to execute the same on behalf of the company. The contract is as follows:

"Canadian, Texas, 11/28/08.

"Articles of agreement between Sam Seiber, party of the first part, and the Canadian Long Distance Telephone Company, party of the second part, witnesseth: The party of the first part agrees to sell to said party of the second part all his telephone lines and equipment in Roberts, Wheeler, Hemphill, Carson, and Gray county, Texas, owned by said party of the first part at this date, November 28, 1908, including the old Western Union poles from Miami to Pampa, Texas. Said party of the first part agrees to not again engage in the telephone business in any of the above counties or in Lipscomb or Ochiltree coun-

ty, Texas. In payment for the above property the party of the second part agrees to pay the party of the first part the sum of thirty-four and fifty-four hundred ($3,454.00) dollars, to be paid as follows: Five hundred ($500.00) dollars in cash and a note for twenty nine hundred and fifty ($2,950.00) dollars, dated January 1st, 1909, due in three (3) years, at eight per cent. (8%) interest from date. Party of the first part is to turn over all of the above property to party of the second part, January 1st, 1909; but at that date party of the first part is to remain in full possession of above property, and operate and keep it in repair, and retain all the revenue from same. Party of the first part is to pay party of the second part eight per cent. interest on the $500.00 cash payment from this date until January 1st, 1909. Signed this the 28th day of November, 1908. C. S. Seiber. A. M. Newman, Pres. O. R. Newman, Mgr. & Sec. Witness: J. R. Long. W. H. Gassaway."

Appellant's sixth assignment attacks the court's ruling in permitting the note sued upon to be introduced in evidence. The note is as follows:

"$2,950.00. Miami, Texas, Jan. 13, 1909.

"On or before three years after date we promise to pay C. S. Seiber, or order, the sum of twenty-nine hundred and fifty and no/100 ($2,950.00) dollars, with interest thereon from date until paid at the rate of eight per centum per annum, payable annually as it accrues, both principal and interest payable at Miami, Texas, for value received. All past due interest on this note shall bear interest from maturity thereof until paid at the rate of ten per centum per annum. The makers and indorsers of this note hereby waive the presentment for payment, notice of nonpayment, protest, and notice of protest, and diligence in bringing suit against any party thereto, and each party signing this note consents that time of payment may be extended without further notice, and it is hereby especially agreed that, if this note is placed in the hands of an attorney for collection, or if collected by suit or through the probate court, then an additional amount of ten per centum on the principal and interest of this note shall be added to the same as collection fees. A. M. Newman, Pres. Canadian L. D. Tel. Co."

Indorsed upon said note was the following: "I hereby guarantee the payment of the within note when due or on demand any time after due. [Signed] A. M. Newman."

[5-7] It is clear to us that the contract does not purport to be other than an undertaking between the appellee and the Canadian Long Distance Telephone Company. There is nothing in it which would indicate that it was the contract of A. M. Newman as an individual, and it stipulates for the execution of the identical note sued upon. Appellant insists that the note upon its face is the note of A. M. Newman alone; but we cannot assent to this contention. It recites, "'We promise to pay," and is executed by A. M. Newman in his official capacity, and payment guaranteed by him as an individual. The words "We promise" create a joint obligation, and must be construed to mean that more than one party is liable for the debt. Hall v. Allcorn, Dallam, Dig. 433; Scanlan v. Keith, 102 Ill. 634, 40 Am. Rep. 624. Newman's relation to the note is fixed and determined by the terms of his indorsement, wherein he guarantees the payment, and in the absence of proper pleadings his liability as shown thereby could not be varied by parol. First National Bank v. Powell, 149 S. W. 1096. If, as contended by appellant, this note is and was intended by the parties to be the note of A. M. Newman alone, there would have been no necessity for the written guaranty by him. If the intention of the parties is to control, the note and contract, when construed together, must be held to be the obligation of the telephone company. F. & M. Bank v. Colby et al., 64 Cal. 352, 28 Pac. 118. Since the record contains evidence tending to show express as well as implied authority on the part of Newman to execute the note and contract, and since there is further evidence tending to show ratification by the company, the court did not err in admitting both instruments in evidence. The fifth and sixth assignments are overruled.

[8, 9] By its seventh assignment appellant urges that the court erred in permitting the plaintiff to testify that at the time he entered into the contract with A. M. Newman, the president, for the sale of his telephone lines he did not have any knowledge that the telephone company had any by-laws, which was objected to for the reason that plaintiff's want of knowledge would not excuse his failure to examine the by-laws to see whether or not the parties executing the contract had authority to do so. And under the eighth assignment it is contended that the court should not have permitted plaintiff to testify that he did not know and had no knowledge from any source that A. M. Newman or O. R. Newman had any lack of authority to do the things they did prior to the time he turned his property over to the company, because the question of authority or lack of authority, when measured by his knowledge, would not bind the defendant by the note and contract, if in truth and in fact no authority to execute the company note existed. As abstract propositions, we think appellant's contention is correct; but, since there is sufficient evidence to warrant the jury in finding both express and implied authority, the errors assigned become harmless. The testimony is negative in its nature, and could not have prejudiced appellant's rights with the jury.

Appellant's ninth, nineteenth, and twentieth assignments question the sufficiency of the evidence to show the authority of Newman to execute the note and the contract, or that he was acting within the scope of his employment in so doing. The statement of facts shows that the capital stock of the company was divided into 400 shares, of which H. E. Hoover owned 54 shares, O. R. Newman 96 shares, and A. M. Newman 250 shares, and that these three parties were the only shareholders, and were at the same time the directors of the company. O. R. Newman testified: "I cannot say the month when I discussed the deal with Mr. Hoover. I talked about it there in Mr. Hoover's office. It was along in the middle part of the forenoon, and Mr. Hoover was expecting to go on a train. He had his suit case or grip in the office, and we talked about the purchase of the Seiber property. When we first mentioned it, Mr. Hoover raised the objection whether it was advisable to compete or buy the lines from Seiber. By competing he meant to build straight in (to Miami and Pampa). We talked about the local conditions at Miami and Pampa, and we talked about the local conditions in Canadian. The final thing along that line was we told Mr. Hoover Seiber was coming down to see us, and he did not come. And we did not know what the final outcome would be, and Mr. Hoover said, 'Let's go easy; do not be too anxious, or he will hold *us* up.' He said, 'Don't be too anxious; leave him alone, and he will come to *our* terms.' We talked a few minutes, and Mr. Hoover said, 'I am busy; I have a lot of things to do;' and he said 'Whatever you fellows do about this thing will be satisfactory to me; you have more time to devote to it,' and mentioned that my father was more interested in it than he was, and devoted more time to it. * * * After making this contract, myself and Mr. Hoover did not talk in regard to having bought the Seiber lines; only we had taken the lines over."

In reference to this conversation, H. E. Hoover testified: "I remember a conversation with Dr. A. M. Newman and O. R. Newman some time about the Seiber lines. I cannot remember the exact date. Some time in December, 1908, I think. My recollection is that the conversation took place in December, which would be after the execution of the contract which has been introduced in evidence; but I would not be positive as to that. The conversation in substance was the question came up of acquiring the Seiber property. I objected to the acquiring of the Seiber property; possibly in the conversation it was agreed that the Seiber property might be acquired—might be left to Dr. Newman as to whether he would buy the Seiber property, or whether or not we would build through and compete with him. I remember the reason why we had the conversation. The conversation, as

I remember it now, being some time past and possibly indistinct, the question first came up on the question of the power of the company to acquire the property, just informal conversation. That was not a meeting of the board of directors of that company by any means. It was just an informal meeting, and was not a director's meeting of the Canadian Long Distance Telephone Company. It was just Dr. Newman and Ross Newman and myself talking. In substance, what took place was I advised Dr. Newman I objected to the acquisition of the Seiber lines by any means. I cannot say just what the conversation was; but in all probability I stated to Dr. Newman that if it was his judgment they ought to be acquired, inasmuch as he was financing the company, and was larger interested in it than I, I would defer to his judgment as to the advisability of acquiring the Seiber lines. I know nothing about Dr. Newman's having a contract with Mr. Seiber; never heard of the contract until after this suit was brought. There was not a word said at that meeting about the contract."

The record further shows that the $500 cash paid at the time of the execution of the contract was advanced by A. M. Newman on his personal check; but it was charged to the company upon the books, and appellee's property also appears to be listed on the invoice books, and the note hereinbefore set out appears upon the books of the company as bills payable by appellant.

After the execution of the contract, appellee returned to Miami, prepared the note, mailed it to Canadian Long Distance Telephone Company at Canadian, and by due course of mail it was returned to him, executed. About three months from this date passed, during which time the appellant completed its line into Miami, made physical connection with appellee's switchboard, and about the date of the note the appellee, under the direction of O. R. Newman, delivered his switchboard to appellant's operators, and from that time on to the date of the trial appellant received the tolls and income from the property purchased from appellee. No effort was made to continue its line beyond Miami to Pampa. O. R. Newman testified: "I was manager and director of the company at the time of making this note, and my father had my consent, as one of the directors, to purchase those properties of Mr. Seiber, because I signed the contract. We conferred together with regard to the purchase. Mr. Hoover, who was the other director, never made any objection outside of the first objection in the meeting where he first discussed the advisability of running a competing line until 1910, after the purchase. Outside of the first objection that I named, he made no objection to our acquiring the lines of C. S. Seiber prior to the making of the contract. My father (A. M. Newman) did not receive any of the rents, revenues,

and tolls personally. I have no knowledge of my father making a bill of sale of this property to the company." He further testified that A. M. Newman purchased the exchanges at Higgins and Canadian for the company.

[10] The tenth, eleventh, twelfth, sixteenth, seventeenth, and eighteenth assignments of error, in a different method, raise the same question, and may all be disposed of as one assignment. As bearing upon the question here discussed, we think the record contains sufficient evidence to warrant the jury in finding that the company was bound by the acts of A. M. Newman in the execution of the contract and of the note. In Aransas Pass Harbor Co. v. L. H. Manning, 94 Tex. 558, 63 S. W. 627, it is said: " 'If, then, the ultimate determination of corporate affairs rests with the stockholders, it is quite absurd to say that their acts are not to be deemed valid unless assented to by their agents, the directors. If, as we shall see, informal acts of the directors and the corporate officers may be ratified and made good by the subsequent conduct or acquiescence of the stockholders, whose agents the former are, why can they not, at least by unanimous consent, do a valid corporate act without the formality of a resolution by their servants, the directors? The sound answer is that they can. On this ground, it was well held that, where the directors own all the shares, they may agree among themselves—not in their character of directors, but rather in their character of stockholders—to authorize the president to sell all the property of the corporation, and that this authorization will be none the less valid because not given at a regular directors' meeting. Other decisions tend to the conclusion that whilst, in theory of law, the corporation and its shareholders are distinct persons, and the latter have no agency for the former, yet equity, which looks to the substance of things, may, in an appropriate case, and for the purposes of justice, treat a debtor corporation and an individual owner of all its shares as identical.' 7 Thompson, Corporations, § 8043."

A. M. Newman, O. R. Newman and H. E. Hoover owned the entire stock of the appellant company; H. E. Hoover owning a fraction over one-eighth. In our judgment when he said to A. M. and O. R. Newman, "Whatever you fellows do about this thing will be satisfactory to me," and this authority was followed by the joint act of A. M. and O. R. Newman purchasing the property, by executing the contract and note, Hoover cannot be heard to challenge the authority of A. M. Newman, even though his acts may have been to some extent informal, irregular, and not exactly in accordance with the ideas of H. E. Hoover, the minority stockholder. In Ft. Worth Publishing Co. v. Hitson, 80 Tex. 228, 14 S. W. 846, the Commission of Appeals, in an opinion approved by Stayton, Chief Justice, said: "It does not appear from the proof that any shareholder or officer in the publishing company dissented from the action of Loving, the manager. As far as we can determine from the record, it was assented to by all and done with their knowledge. Conceding that there was no formal transfer of the property under the corporate seal, the case then calls for the application of principles independent of contracts of sale, and, under the application of such rules, we can see no good reason why a corporation may not be bound by acts of acquiescence in a transaction which may be irregular on its face, if not prohibited, or which may be in excess of the officer's power acting for the corporation. In this case there was a transfer and delivery of the property to the defendant in attachment by Loving, the manager of the publishing company, and the stockholders collectively. This may have been in excess of their power. The act, however, was not illegal, and they believed they had the authority. The Investment Company, Limited, received the property, expended the money on it, managed it, and, it is to be presumed, was preparing in the conduct of its business to liquidate the indebtedness of the claimant company and the old investment company, which it had assumed in the manner before explained." And from the same case, as bearing upon one contention of appellant under these assignments, it is said: "The acts of a private corporation may be shown by other testimony than a record or minutes of its proceedings, unless the statute declares to the contrary. Its acts may be proved by direct evidence, or may be inferred from circumstances."

Article 1153, Revised Statutes 1911, provides that "A majority of the directors or trustees" of a corporation "shall constitute a quorum, and be competent to * * * transact all business of the corporation." Immediately preceding this transaction, the appellant company had been absorbing other telephone lines in that section of the state, and from the language used by Hoover and the Newmans it is patent that they intended to either take over the appellee's property or establish a competing line.

[11, 12] The minute book of the company was a meager affair, and contained only a record of the first called meeting, the annual meetings for the election of officers, and providing for the increase of the capital stock, and fixing the officers' salaries. It is held in Watts v. Gordon (Tenn.) 153 S. W. 483, citing Thompson on Corporations, that recordation in the minutes of the company does not make a corporate act valid, but simply preserves evidence of it, and is not essential unless the charter or a statute requires it. If the failure of appellant's minute book to show the authority of Newman to purchase appellee's property for and on behalf of the company could be taken advantage of by appellant, then it could refuse to

pay for any other lines which it had absorbed, and for which payment had not been made, although purchased by Newman and used to the pecuniary advantage of appellant. Appellee's insistence that Newman had no authority to purchase the lines, and that he purchased the property for himself, is inconsistent with other facts as well as with our ideas of the equity of this case. It is affirmatively shown that Newman has never made a transfer, either verbal or written, of appellee's property to appellant, and yet from the very hour in which appellant insists Newman acquired the property in his individual capacity appellant has assumed control and has been appropriating to its own benefit the income and revenues derived therefrom. As said in Cold Storage Co. v. Crawford, 18 Tex. Civ. App. 176, 44 S. W. 875: "It is contended by appellant that Dawley & Myrick derived their authorities solely from the by-laws, and that acts done by them not within the scope of the same were not binding upon the company. * * * An affirmance of the judgment does not necessarily depend upon the conclusion heretofore reached that Dawley & Myrick acted within the scope of the authority delegated to them by virtue of the by-laws. The rule invoked by appellees, we think, is the correct one. It is expressed in the following language by Mr. Mechem, in his excellent work on Agency (section 207): 'It is lawful for the principal to confer as much or as little authority as he sees fit. He may impose all such lawful restrictions and limitations on it as he thinks desirable, and these restrictions will be binding and conclusive upon third persons who have notice of them, provided the principal has done nothing to waive or nullify them. * * * Although the agent violates his instructions or exceeds the limitations as to his authority, he will yet bind his principal to such third persons, if his acts are within the scope of authority which the principal has caused or permitted him to appear to possess.' This principle applies to private corporations as well as to individuals." Knox City Milling Co. v. Warren, 141 S. W. 1007; Toyaho Creek Irrigation Co. v. Hutchins, 21 Tex. Civ. App. 274, 52 S. W. 101. These assignments are overruled.

[13, 14] The fourteenth, twenty-first, twenty-second, twenty-third, twenty-fourth, and twenty-fifth assignments all raise the issues of ratification, and acquiescence, and the sufficiency of the evidence to show knowledge on the part of the company of what had been done by Newman. From what has already been said, it is shown that the two stockholders owning almost seven-eighths of the capital stock of the company participated in the execution of the contract, which provided for the execution of the note, and it must have been known to O. R. Newman that the note was subsequently executed by his father. H. E. Hoover appears to be the contending stockholder in this litigation, and so far as this suit is concerned he represents the corporation. Having given A. M. & O. R. Newman carte blanche to acquire appellee's property, he must be held to have known how they had exercised the authority given them by him. It seems reasonable to infer that he knew of the physical connection which appellant had made with appellee's switchboard, and the further fact that appellant's operator had taken charge of appellee's property under the direction of O. R. Newman, who was the manager and secretary of appellant company, and that appellant company was receiving the tolls and revenues. As further bearing upon the question of ratification and knowledge on the part of the stockholders, it appears from the statement of facts that on December 8, 1908, the $500 paid appellee was charged as a disbursement on the appellant's cashbook, and on the 13th of January, 1909, being the date of the note sued upon, an entry was made in appellant's cashbook, describing the purchase of Seiber's line, the price, and the note given therefor. On January 11, 1910, appellee received a check for the first year's interest upon his note signed by A. M. Newman, as treasurer of the appellant company, and on the same date the amount of said check, $236, was charged against appellant company on its cashbook, under "Order No. 1013," and following this entry the note sued upon is listed upon appellant company's invoice book under the head of "Bills Payable." On January 1, 1910, A. M. Newman, as treasurer, tendered his report to appellant, which was accepted, showing all receipts from the exchanges at Miami and Pampa as receipts of appellant company. On January 29, 1910, appellant company decided to employ an auditor to audit the books and appraise the equipment of appellant company, and his report thereafter filed listed appellee's property as "Tolls, line, bgt. of C. S. Seiber, $3,450.00," which was the contract price of appellant's property. All of these entries flatly contradict appellant's contention that it had no knowledge of the nature of the transaction through which Seiber's lines were acquired, and are not in tuneful accord with the theory that nothing has been done to ratify the purchase. In the case of Elk Valley Coal Co. v. Thompson, 150 Ky. 614, 150 S. W. 817, it is said: "The general rule is that, where there has been no formal ratification or approval by the board of directors at a regular meeting of an unauthorized act of any agent, the question whether individual acquiescence or failure to disaffirm will amount to ratification or approval, as in many instances it may, depends on the facts of each case. Where the unauthorized act is beneficial to the corporation, and the directors have individual knowledge of it, slight evidence will be sufficient to establish ratification by acquiescence or failure to repudiate, and this upon the theory that a party who accepts benefits will

be deemed to have done so with a knowledge of the conditions and circumstances surrounding the transaction out of which the act creating the benefit arose, and must take the burdens of the benefits." Ft. Worth Publishing Co. v. Hitson, supra, and Kincheloe Irr. Co. v. Hahn Bros. (Sup.) 146 S. W. 1187, are authority for this doctrine: "If the contract entered into was for a business not authorized by defendant's charter and therefore ultra vires, a plea setting up such defense is unavailing, if as matter of fact the corporation received benefits under such agreement. It may be stated as a rule of law that an action for damages for breach of contract will not be avoided by plea of ultra vires, when the corporation has received benefits under the alleged illegal contract. In such a case, and under such circumstances, the corporation is estopped from denying its power to make the contract"—citing, amongst other authorities, Steger et al. v. Davis et al., 8 Tex. Civ. App. 23, 27 S. W. 1068.

[15] Appellant further complains of the refusal of the court to give its eleventh special charge, to the effect that if the jury should find and believe from the evidence that the defendant disavowed the note, and notified plaintiff to that effect, and the plaintiff then declared to the defendant or any of its directors that he was looking to Newman for the payment of the note, and that he had sold his property to Newman, and was not looking to the defendant company for payment, then to find for the defendant. This special charge is manifestly error. Before the jury could find for the defendant, they must not only find that plaintiff *had declared that he was looking to Newman alone for payment*, but they must further find as a fact that he was looking alone to him for payment, and that appellant had been released in some way from its obligation to pay.

The fifteenth assignment is without merit, and is overruled.

We think the charge of the court, taken as a whole, was a full and fair presentation of all the issues raised by the pleadings and the evidence. Finding no reversible error in the record, the judgment is affirmed.